**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-451-CJN** |
| **v.** | : | |
| | : | |
| **SUZANNE IANNI,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Suzanne Ianni to thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.

**I.      Introduction**

Defendant Suzanne Ianni, age 60, a former electrical engineer who has been unemployed for several years, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on September 14, 2022, reflects a sum of more than $1.4 million dollars for repairs, [ECF No. 47 ¶ 6], as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Ianni pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(D).  As explained herein, a sentence of incarceration is appropriate in this case because (1) Ianni led rioters in chants of "fight for Trump," while seeing rioters breaking doors and windows to gain access to the Capitol; (2) Ianni witnessed people who had been injured as they attempted to break into the Capitol; (3) when Ianni was finally able to enter the Capitol, she was part of a group that confronted and eventually overwhelmed police officers, allowing the group to move further into the Capitol; and (4) as of the time of this filing, Ianni has not expressed remorse for her actions on January 6.

The Court must also consider that Ianni's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Here, the facts of and circumstances of Ianni's crime support a sentence of thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 47 (Statement of Offense), at 1-7.

### Defendant Ianni's Role in the January 6, 2021 Attack on the Capitol

In the days before January 6, 2021, Ianni organized bus transportation from Boston, Massachusetts, to Washington, D.C., for members of "Super Happy Fun America."  The group describes itself as "a right of center civil rights organization focusing on defending the

Constitution, opposing gender madness and defeating cultural Marxism."[2]  On January 5, 2021, Ianni travelled from Boston, Massachusetts, to Washington, D.C., with other members of "Super Happy Fun America" to protest Congress' certification of the Electoral College.  Image 1, below, shows Ianni on one of "Super Happy Fun America's" buses, traveling to D.C.



[Image 1]

At approximately 2:40 p.m., Ianni was with a large group outside the Senate Wing Door. While Ianni joined the group in chanting, "Fight for Trump," and told the group that they had to "fight for [their] rights," other rioters were breaking the doors and windows and breaching police barricades.  Image 2, below, shows Ianni, fist raised, as she chanted "Fight for Trump."  In the image, you can see the window, which is just to the north of the Senate Wing Door.

---

[2]  *See*  "*About*,"  SUPER  HAPPY  FUN  AMERICA,  (available  at: https://superhappyfunamerica.org/home/about/).  In addition to bringing members to the "Stop the Steal" rally, Super Happy Fun America also organized a Boston Straight Pride Parade and a protest of the "Crimes of the FBI" on August 21, 2022.  In describing the "Crimes of the FBI," Super Happy Fun America's website lists, among others, "Fake Whitmer Kidnapping Plot" and "The Obvious Involvement of the FBI on January 6th."  *See* "*Crimes of the FBI*," SUPER HAPPY FUN AMERICA, (available at: https://superhappyfunamerica.org/crimes-of-the-fbi/).



[Image 2]

While Ianni chanted, people around her covered their mouths and said that tear gas was being deployed.  In fact, some rioters at the front of the line turned around and retreated past Ianni, telling the crowd that "tear gas [was] coming out" of the Capitol.

In Image 3, below, Ianni is a few feet away from rioters who broke the windows of the Senate Wing Door into the Capitol and opened the door, allowing a group of rioters to try to enter.



[Image 3]

Ianni then moved to the fire door on the north side of the Northwest Plaza, next to the Senate Parliamentarian's Office, and entered the Capitol at approximately 2:45 p.m.  Image 4, below, shows Ianni entering the Capitol and walking by a person who is visibly coughing and appears to be bleeding.



[Image 4]

Once in the Capitol, Ianni proceeded past the North Door Appointment Desk, as seen in Image 5, below.



[Image 5]

Ianni then proceeded to the Brumidi Corridor, where she was part of a group that confronted police officers near the North Appointment Desk at roughly 2:58 p.m., as seen in Image 6, below.  Ianni again raised her fist in obvious support of the assault on the Capitol.



[Image 6]

As seen in Image 7, below, a group of police officers formed a line across the hallway in an attempt to hold the rioters back from getting further into the Capitol. But the rioters, including Ianni, who was within roughly a body length from the officers, confronted and surrounded the officers and eventually pushed past them.



[Image 7]

Image 8, below, provides a different view of the group, as they confronted those police officers.  Ianni was near the front of that group, raising her fist and yelling.



[Image 8]

Although Ianni is not alleged to have violently engaged with these officers, she walked directly next to them as she proceeded further into the Capitol, after a line of police officers had previously tried to stop her, and the rest of her group.  In Image 9, below, Ianni walked past the now overwhelmed and breached police line that previously had been prevented her and her fellow rioters from moving further into the Capitol.



[Image 9]

After remaining the Capitol for a few more minutes, Ianni exited the Capitol at roughly 3:04 p.m. through the same door through which she entered, as seen in Image 10, below.



[Image 10]

In total, Ianni remained in the Capitol for approximately twenty-three minutes, during which time she saw other rioters breaking windows and doors to gain access into the Capitol, walked by injured rioters when entering the Capitol, confronted a line of police officers, and eventually walked past those police officers to get further into the Capitol.

*Ianni's Fundraising Based on her Participation in the Riot*

Ianni has raised money based on her participation in the January 6 riot. Her fundraising website, seeking donations for her defense in this very case, claims that Ianni is a "patriotic American[] who [is] facing a legal battle due to peacefully attending the rally in Washington, DC on January 6th." *See* GiveSendGo, "Mark Sahady and Sue Ianni Legal Fund" (available at: https://www.givesendgo.com/G233T). The site, seeking donations, claims that Ianni was

"arrested by the FBI on January 19[th] and charged with misdemeanors even though" she was "peacefully protesting to demand integrity in the Presidential election." *Id.* The site goes on to characterize this case as a "political prosecution." *Id.*

*The Charges and Plea Agreement*

On January 18, 2021, the United States charged Ianni by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D). [ECF No. 1 at 1]. On January 19, 2021, law enforcement officers arrested her at home in Natick, Massachusetts. On March 22, 2022, the United States charged Ianni by a three-count superseding information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(D). [ECF No. 37]. On January 14, 2022, pursuant to a plea agreement, Ianni pleaded guilty to Count Three of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(D). [ECF No. 46]. In that plea agreement, Ianni agreed to pay $500 in restitution to the Department of the Treasury. [*Id.* at 6].

## III.    Statutory Penalties

Ianni now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, Ianni faces up to six months of imprisonment and a fine of up to $5,000. Ianni must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Ianni's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Ianni, the absence of violent or destructive acts is not a mitigating factor.  Had Ianni engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Ianni's case is her presence at a chaotic and violent scene shortly before entering the Capitol.  Ianni was present near the front of a mob of rioters who broke through the Senate Wing Door to enter the Capitol.  She entered the Capitol through the fire door near the Senate Parliamentarian's Office, at which point she was part of a group that confronted a few outnumbered officers standing in an interior doorway helped to render the police defenseless to prevent hundreds of rioters from entering the Capitol behind her.  As is clearly

shown by the photos included above, as well as video footage of the events outside of the Capitol that will be provided to the Court separately, Ianni was mere feet away from individuals breaking into the Capitol through the Senate Wing Door by breaking doors and windows.  Faced with this violent attack on the Capitol, she joined, and even attempted to lead, the crowd in chants of "Fight for Trump," "Fight for your rights," and "Our house."  When attempts to gain entry into the Capitol through those broken doors and windows slowed, Ianni moved towards the fire door near the Parliamentarian's Office, which other rioters had recently opened.  In order to enter the Capitol, she walked by an individual whose face was bleeding and who was washing his face with water, after having assumedly been teargassed.

And yet, Ianni continued.  Once again, she was confronted with an obstacle, a police line that was trying to prevent her and the group of rioters that entered the Capitol with her from moving further into the Capitol.  They were unable to hold that line and Ianni and the other rioters overwhelmed them.  Ianni then continued deeper into the Capitol.

Ianni clearly knew that she was in the Capitol unlawfully.  Given her shouted statements, encouraging her fellow rioters to "fight for their rights," while she saw people breaking doors and windows, it's evident that she also clearly knew that the riot was becoming a violent takeover of the Capitol.

### B.  The History and Characteristics of Ianni

As set forth in the PSR, Suzanne Ianni does not have a criminal history.  Despite lacking a criminal history, her actions during the January 6th Riot indicate a real need for a sentence that provides specific deterrence, as discussed further below.  Additionally, as of the time of filing, Ianni has not expressed remorse for her actions on January 6.  According to the presentence report, during her interview, Ianni "agreed with the conduct described in the Statement of Offense as

presented to the Court prior to the guilty plea," but "made no additional statements regarding the offense."  [ECF No. 51 ¶ 24].

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be

deterred."  (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence.  *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As more fully discussed above, the facts of this case, including Ianni's encouraging her fellow rioters with chants while they broke windows and doors and confronted police officers, strongly weigh in favor of a sentence that will specifically deter Suzanne Ianni from participating in any potential future violence.

Additionally, it spears that Ianni continues to minimize the events of January 6, 2021.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This Court must sentence Ianni based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6th riot.

Ianni has pleaded guilty to Count Three of the Superseding Information, charging her with disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D).  [ECF No. 46].  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But, nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases.  *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues.  And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences.  The statutory range of for a petty offense is zero to six months.  Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.  *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense.  And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

- *Pamela Anne Hemphill*, 1:21-cr-00555 (the court imposed a sentence of sixty days' incarceration and three years' probation when defendant encouraged other rioters to break through police barricades, although, in that case, the defendant had also posted violent rhetoric on her social media accounts regarding her reasons for storming the Capitol and was one of the first in a group to break through police barricades outside of the Capitol).

- *Jeremiah Carollo*, 1:22-cr-00044 (the court imposed a sentence of twelve months' probation, with a special condition that the defendant would be incarcerated for the first twenty-one days of probation, for defendant who, although he did not commit violence against law enforcement, encouraged other members of a group to breach two police lines).

- *Blas Santillan*, 1:22-cr-00032 (the court imposed a sentence of forty-five days' incarceration and thirty-six months' probation for a defendant who entered the Capitol by

storming through the Rotunda Doors just eight minutes after the doors were breached by

other rioters and, after witnessing violent clashes with the police, encouraged other rioters

by shouting and raising his fist, although, in that case, the defendant also had a troubling

criminal history).

- *Dalton Crase*, 1:21-cr-00082-CJN (this Court imposed a sentence of thirty-six months'
  probation with a special condition of fifteen days' intermittent confinement for defendant
  who, like Ianni, entered through the Senate Parliamentarian Door, who saw doors being
  broken and tear gas being deployed).

- *Troy Williams*, 1:21-cr-00082-CJN (same).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v.

Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant."  *Id*. at 1095.

## V.     This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

As eight judges of this District have now concluded, this Court has the authority under 18

§ 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment

and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*,
*United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)
(concluding that " a split sentence is permissible under law and warranted by the circumstances of
this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK),
2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible
in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1
(D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense
and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290
(RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*,
21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP),
ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C.
July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022)
(same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United
States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same).[4]

But this Court need not decide that question in this case because there is no dispute that
such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights,
weekends, or other intervals of time, totaling no more than the lesser of one year or the term of
imprisonment authorized for the offense, during the first year of the term of probation or supervised
release."  18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts
"flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.

---

[4] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three
counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).  Chief Judge
Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served
concurrently, and 36 months' probation on the § 1752(a)(1) count.

S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A fourteen-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks, but less than thirty days, is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here.   Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.   For that reason, any fourteen-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.   Balancing these factors, the government recommends that this Court sentence Defendant to thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing his acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Thomas Campbell*
Thomas D. Campbell
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 262-7778
Email: thomas.campbell@usdoj.gov

25

## <u>CERTIFICATE OF SERVICE</u>

On this 28th day of November, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.


By:     <u>s/ *Thomas Campbell*</u>
           Thomas D. Campbell
           Trial Attorney
           Criminal Division, Fraud Section
           U.S. Department of Justice
           1400 New York Ave. NW
           Washington, DC 20005
           Tel: (202) 262-7778
           Email: thomas.campbell@usdoj.gov